**EXHIBIT 2**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WHITE PLAINS AVIATION PARTNERS, LLC d/b/a MILLION AIR WHITE PLAINS,<br><br>                    Plaintiff,<br><br>        -against-<br><br>THE COUNTY OF WESTCHESTER,<br><br>                    Defendant. | Case No. 21 Civ. 5312 (VB)<br><br>**[PROPOSED] FIRST AMENDED COMPLAINT** |

Plaintiff White Plains Aviation Partners, LLC d/b/a Million Air White Plains ("Million Air"), by and through its undersigned counsel, as its First Amended Complaint for declaratory and other relief against defendant the County of Westchester (the "County"), respectfully alleges as follows:

## NATURE OF THE ACTION

1.      In this action, Million Air seeks to redress the County's multiple breaches of its lease agreement with Million Air (the "Lease") for premises located at Westchester County Airport (the "Airport"), as well as the County's ensuing bad-faith course of conduct toward Million Air over the last several years. The County's material breaches of the Lease and its subsequent bad-faith conduct have already caused and will cause Million Air's business to suffer millions of dollars in damages of over $30 million, an amount which increases by approximately $175,000 each week that the County fails to comply with its obligations under the Lease.

2.      Given the County's improper actions and damage to Million Air's business, Million Air brings this action pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and

2202, for an expedited declaration that the County breached the Lease by unreasonably failing to approve Million Air's proposed modifications to an existing hangar on the leased premises at the Airport; an Order from the Court directing the County to comply with the Lease and approve the requested modifications to the hangar; and an award of ~~over $30 million in~~ damages.

3. Million Air's corporate parent operates state-of-the-art "fixed base operations" ("FBOs") at airports around the country and internationally. These FBOs provide a multitude of services for private aircraft, passengers, and pilots, including hangars to store aircraft, maintenance and fueling services, and a high-end lounge and terminal.

4. The Lease, which the County and Million Air entered into in 2016, authorized Million Air to operate an FBO on the leased premises at the Airport, which included a terminal building and a hangar. Million Air was further authorized to substantially expand and refurbish the terminal building, as well as construct a new 50,000 square foot hangar (the*se projects are referred to in the Lease as the* "~~Initial~~*Proposed* Improvements"). Million Air successfully completed the ~~Initial~~*Proposed* Improvements, which have resulted in significant benefits to the County and its residents, including more than forty permanent jobs, hundreds of temporary construction jobs, reduced air traffic because of increased hangar space, and tax and rental revenue for the County.

5. In addition to the ~~Initial~~*Proposed* Improvements, the Lease also contemplated additional improvements to the leased premises. The Lease*, in Section 6.2,* provides that Million Air can make "material changes or modifications" to the plans for the leased premises, and *in a separate provision,* specifically identifies construction of "additional hangars" by Million Air as an example of such contemplated and acceptable "material changes or modifications." *The Lease also provides in Section 5.5 that, after the completion of the Proposed Improvements, Million*

2

Air can undertake "major" improvements on the leased premises, including major "construction, alterations, modifications, additions or replacements."

6.      The Lease ~~also~~ prohibits the County from "unreasonably" withholding, delaying, or conditioning its consent to such ~~changes or modifications~~requests by Million Air for improvements. ~~Moreover, if the County has a reasonable basis not to consent, the Lease requires the parties to engage in an iterative process so that Million Air can work to address the County's reasonable concerns~~.

7.      Indeed, Million Air and the County had discussed Million Air's plans to modify the existing, out-of-date hangar (the "Existing Hangar") on the leased premises by replacing it with a state-of-the-art, eco-friendly hangar (the "Modified Hangar") before entering into the Lease. The parties understood that, once Million Air successfully completed the ~~Initial~~Proposed Improvements, the Modified Hangar would be built in a second phase of construction.

8.      Pursuant to the Lease, Million Air submitted plans to the County in November 2017 to construct the Modified Hangar.

9.      In requesting the County's approval of the Modified Hangar, Million Air demonstrated that the Modified Hangar would create additional jobs, improve facilities at the Airport, and increase County and municipal revenues.

10.      Million Air also demonstrated that the Modified Hangar would bring important environmental benefits, by significantly reducing flight traffic in Westchester. Because of limited hangar space at the Airport, many aircraft must engage in non-productive "ferry" flights to regional airports to be hangared while awaiting their passengers' return flights. The construction of the Modified Hangar would expand available hangar space and thereby decrease net flights in and out of the Airport by more than 1,000 flights per year. This decrease in flight congestion

would correspondingly decrease noise – something the County has repeatedly identified as a primary concern – and carbon emissions.

11.     Despite the Lease provisions authorizing the Modified Hangar, and the significant benefits to the County and its residents from that hangar, the County failed to approve Million Air's November 2017 request to build the hangar.

12.     In denying Million Air's request to build the Modified Hangar, the County did not provide, and has never provided, a reasonable basis for its decision, instead offering only conclusory and wildly inconsistent reasons for denying approval. This is a plain breach of the Lease.

13.     For example, the County has claimed, in conclusory fashion, that the Modified Hangar is not "required," a standard that is an improper and unreasonable basis for denial under the Lease. Similarly, the County stated that Million Air must obtain various environmental approvals prior to approval, even though the Lease provides that the County is to assist Million Air in obtaining those approvals *after* the County approves plans for material changes like the Modified Hangar.

14.     Most recently, Tthe County has also contended that the Lease does not even apply to the Modified Hangar because it is not a modification of the original plans for the leased premises, but instead a "new project" that requires a new or amended lease. This position is wholly inconsistent with the County's other stated reasons for failing to approve the Modified Hangar and with the fact that the plans for the Initial Proposed Improvements depict the Existing Hangar that was to be modified. Moreover, the County's position is clearly contradicted by the terms of the Lease, which explicitly contemplate additional hangars on the leased premises.

15.     Beyond the County's changing and incoherent reasons for refusing to comply with its obligations under the Lease, the County compounded its bad faith by making a series of extra-contractual demands of Million Air. According to the County, compliance with these additional demands would enable Million Air to obtain the County's approval for the Modified Hangar.

16.     Million Air voluntarily complied with all of the County's additional demands in a good faith effort to work with the County, without any contractual obligation to do so. Despite Million Air's ongoing good-faith attempts to work with the County, the County has continued to deny failed to approve approval of the Modified Hangar.

17.     Indeed, whenever the County has asked Million Air to take steps to move the project forward – including sending multiple drafts of an amended lease the County requested, commissioning an independent report regarding the benefits of the Modified Hangar, and submitting voluminous materials for environmental approvals from various government bodies – Million Air has always complied. But to no avail. The County has repeatedly moved the goal posts and continued to unreasonably deny approval of the plans for the Modified Hangar.

18.     For example, for the first several months of 2018, the County instructed Million Air to complete construction of the Initial Proposed Improvements without a stormwater management system, on the explicit understanding between the County and Million Air that such a system would be installed for the entire site during construction of the Modified Hangar. Then, in late 2018, the County reversed course and informed Million Air that it would not allow additional construction or approve the Modified Hangar until a stormwater system was installed for the Initial Proposed Improvements alone. Worse still, the County contended that this reversal had always been its position, despite its previous statements to the contrary.

5

19.     These actions by the County are not consistent with the good faith and fair dealing required between parties to a contract. To the contrary, the County's actions appear to have been taken in bad faith and are a breach of the Lease.

20.     Based on the County's bad-faith conduct, Million Air initiated the instant lawsuit on June 16, 2021. Million Air alleged, *inter alia*, that the County violated Section 6.2 by unreasonably refusing to approve of the Modified Hangar and also violated the covenant of good faith and fair dealing in the Lease.

21.     The County moved to dismiss Million Air's Complaint, and on March 11, 2022, the Court issued an Opinion and Order (the "Order") denying the County's motion in part and granting it in part. In the Order, the Court upheld Million Air's claim that the County breached the implied covenant of good faith and fair dealing in the Lease, but dismissed Million Air's breach of contract claims, ruling that Section 6.2 did not apply to Million Air's request for the County's approval of the Modified Hangar.[1]

19.22.  On March 16, 2022, Million Air sent a letter notifying the County of its continued desire to build the Modified Hangar and requesting approval under Section 5.5 of the Lease. On April 22, 2022, the County responded and did not approve Million Airs' request, instead setting forth a series of unreasonable reasons as to why its consideration of the request would be premature at this time. The County thereby violated Section 5.5 of the Lease, which requires that approval for requested improvements not be unreasonably withheld, delayed, or conditioned.

---

[1] By removing from this First Amended Complaint the claims dismissed by the Court in the Order, Million Air does not waive its right to appeal the dismissal of these claims. *See Hancock v. County of Rensselaer*, 882 F.3d 58, 63 (2d Cir. 2018); *In re Crysen/Montenay Energy Co.*, 226 F.3d 160, 162 (2d Cir. 2000).

20.23.  The County's bad-faith conduct and improper failure to approve the Modified Hangar haves caused and will cause tens of millions of dollars of damages to Million Air, which has turned away or lost customers who would have purchased services or leased space at the Modified Hangar. Those lost customers would have generated approximately $15 million in revenue for Million Air. And As a result of those lost customers, each week that passes without the County's approval costs Million Air approximately $175,000 in additional lost revenue. Moreover, the County's bad-faith reversal of its instructions with respect to the stormwater system will cost Million Air upwards of an additional $3.5 millions of dollars, due to, among other things, the costs of demolishing portions of the already constructed Initial Proposed Improvements necessary to install this system, and the accompanying disruption to Million Air's business. And, because of changes in market conditions and commodity prices, the projected construction cost of the stormwater system and Modified Hangar is now approximately $12 million more than it was in 2018significantly higher.

21.24.  Million Air now seeks the Court's intervention to enforce its rights under the Lease to build the Modified Hangar, and to compensate it for the damages caused by the County's contractual breaches and bad-faith conduct.

## THE PARTIES

22.25.  Million Air is a Delaware limited liability company, authorized to do business in the State of New York, having a place of business at 136 Tower Road, West Harrison, New York 10604.

23.26.  The sole member of Million Air is Million Air Two, LLC, which is a Delaware limited liability company. The sole member of Million Air Two, LLC is REW Investments, Inc.,

a Texas corporation with its principal place of business at 7555 Ipswich Road, Houston, Texas 77061. Accordingly, for purposes of diversity of citizenship, Million Air is a citizen of Texas.

24.27.  Upon information and belief, the County is a municipal corporation of the State of New York, having its principal place of business at the Michaelian Office Building, 148 Martine Avenue, White Plains, New York 10601.

## JURISDICTION AND VENUE

25.28.  The Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(1) because there is complete diversity of citizenship between Million Air and the County, and because the amount in controversy with respect to Million Air's claims exceeds the sum of $75,000, exclusive of interest and costs.

26.29.  This action is properly brought in this Court pursuant to 28 U.S.C. § 1391 because the County is located within this District, the events complained of herein took place within this District, and the property that is the subject of this action is situated within this District.

## FACTUAL BACKGROUND

### Million Air and Its Business

27.30.  The corporate parent of Million Air owns and operates FBOs at multiple airports in North America and around the world. Million Air operates the FBO at the Airport.

28.31.  All "Million Air"-branded FBOs are luxury service facilities for individually and corporate owned private aircraft, including those owned by light general aviation users who fly more recreationally or infrequently in comparatively smaller planes.

29.32.  Million Air offers a multitude of services for private aircraft and their passengers and pilots, including hangars where the aircraft can be stored, a state-of-the-art terminal where passengers and pilots can work or relax, and fueling, de-icing, repairs, and maintenance services.

8

30.33.  Million Air's employees regularly provide passengers or pilots recommendations for local hotels, restaurants, shops, and other attractions.

31.34.  Although Million Air currently operates one terminal and hangar at the Airport, it technically operates two FBOs at the Airport: a Light General Aviation ("LGA") FBO, where private aircraft under 50,000 pounds are serviced and based, and a Heavy General Aviation ("HGA") FBO, which accommodates aircraft up to 120,000 pounds.

32.35.  Some arriving aircraft are stored at Million Air's hangar at the Airport, where the aircraft can be serviced before departing. Because Million Air's hangar space is limited, other arriving aircraft fly out of the Airport after their passengers de-plane and are hangared at surrounding airports until they return to pick up their passengers to fly to their next destination. Such flights to and from surrounding airports – where the passengers are in fact only using the Airport – are called "repositioning" or "ferry" flights.

33.36.  Million Air also leases office space at its terminal at the Airport to a flight school and other companies in the aviation industry, and provides charter management, aircraft management, aircraft fuels, and lubricant sales.

34.37.  In 2020, Professional Pilot Magazine named Million Air's parent company "Best Large FBO Chain in the Nation" for the ninth consecutive year. Consistent with that honor, Million Air provides arriving passengers with an indelibly positive first impression of the Airport and the County.

**Background on the Lease**

35.38.  In October 2014, Million Air was assigned and assumed a lease that had been in place since 1999 between the County and Westair Aviation Services LLC ("Westair"), and

thereby began leasing approximately 22.4 acres of land at the Airport. The leased premises included the out-of-date Existing Hangar, aircraft ramps, and a terminal.

36.39.   Under the Westair lease, Million Air was permitted to operate only an LGA FBO.

37.40.   After taking over the Westair lease, Million Air began negotiating the Lease with the County. Million Air wished to fully implement its business model at the Airport by operating a full-service HGA FBO that could accommodate aircraft weighing up to 120,000 pounds.

38.41.   During its negotiations with the County, Million Air proposed to (1) construct a new, approximately 50,000 square foot hangar, (2) expand by 17,000 square feet and upgrade the existing terminal and lounge, (3) construct the Modified Hangar to replace the Existing Hangar, and (4) construct additional hangars.

39.42.   The County recognized that such investment and improvements at the Airport would be good not only for Million Air's business, but for the County as well, and worked with Million Air toward execution of the Lease.

40.43.   As part of this process, Million Air, with the cooperation of the County, submitted plans for the leased premises to the Westchester County Board of Legislators ("BOL") for a full-scale environmental review under the New York State Environmental Quality Review Act (SEQRA). In May 2016, the BOL issued a "Negative Declaration" under SEQRA for the project, i.e., a finding of no significant adverse environmental impacts.

41.44.   During their lease negotiations, Million Air made clear to the County that it intended to construct the Modified Hangar on the leased premises. However, the parties agreed that the "InitialProposed Improvements" specifically authorized by the Lease would only include constructing the new 50,000 square foot hangar and expanding and improving the existing terminal.

42.45.  The primary reason the parties agreed that the Modified Hangar, and additional hangars, would not be included in the ~~Initial~~Proposed Improvements was the County's concern that Million Air might not be able to complete the full project, including the Modified Hangar, in a timely manner. According to the County, this was a problem the County had faced before, as other businesses had made promises of major investments at the Airport or elsewhere and failed to fulfill those promises.

43.46.  The parties therefore agreed to limit the projects specifically authorized by the Lease to the ~~Initial~~Proposed Improvements, with the understanding that Million Air, with the County's support, would construct the Modified Hangar (and additional hangars) at a future date. To that end, the Lease specifically provided that Million Air could make material changes or modifications to its plans for the leased premises, including by constructing additional hangars, with the County's consent, which was not to be unreasonably withheld, delayed, or conditioned.

44.47.  After the BOL authorized the Lease, the parties executed it in May 2016. The Lease's thirty-year term began on June 1, 2016. The Lease is attached hereto as Exhibit A.

**Relevant Provisions of the Lease**

45.48.  Article 6 and Schedule C of the Lease set forth the plans and specifications for the ~~Initial~~Proposed Improvements (the "Plans") and Article 6 provides a mechanism for modifying them.

46.49.  Section 6.1 states that Million Air "desires to perform and construct" the ~~Initial~~Proposed Improvements (defined in the Lease as the "Proposed Improvements") – that is, the construction of the approximately 50,000 square foot hangar and the 17,000 square foot addition and upgrade to the existing terminal.

47.50.  Section 6.2 states that the ~~Initial~~Proposed Improvements "are hereby approved by the County."

48.51.  Section 6.2 also allows for changes or modifications to the Plans for the ~~Initial~~Proposed Improvements, as follows:

> If . . . material changes or modifications are required to the Plans or the Proposed Improvements, Lessee . . . shall make such changes or modifications to the Plans (the "Modified Plans") and submit same to the County for the County's consent and approval, **which consent and approval shall not be unreasonably withheld, delayed or conditioned**. . . . If the County shall disapprove of the Modified Plans, then such disapproval shall be in writing **specifically identifying the County's objection and stating the reasons therefor** and, thereafter, Lessee shall have the right to further amend the Modified Plans, taking into consideration the County's objection and the reasons therefor and re-submitting the Modified Plans to the County for its approval in accordance with this Section. (Emphasis added.)

49.   Under Section 6.5 of the Lease, the County agreed that, "if requested" by Million Air, it would "assist and cooperate with [Million Air] in good faith" in obtaining "any and all approvals" required from any governmental authorities, whether in connection with the ~~Initial~~Proposed Improvements or any "Modified Plans" permitted under Section 6.2.

52.

50.53.  In sum, Article 6 creates a procedure by which (1) Million Air submits proposed "material changes or modifications" to the Plans for the Initial Improvements ("Modified Plans") to the County; (2) the County promptly either approves the Modified Plans or sets forth in writing the reasonable bases for its objections; (3) if the County disapproves the Modified Plans, Million Air has the opportunity to respond, thus initiating an iterative process where the County's ultimate approval of the Modified Plans will not be unreasonably withheld, delayed, or conditioned; and (4) after approval of the Modified Plans, the County and Million Air work jointly to secure any necessary governmental approvals for the Modified Plans.

51.    The Plans shown in Schedule C depict the Existing Hangar. As the Existing Hangar is a part of the Plans, a material change or modification to the Plans would include Million Air's planned construction of the Modified Hangar and would constitute Modified Plans. And as noted above, the County was fully aware that Million Air intended to modify and improve the Existing Hangar by constructing the Modified Hangar.

52.54.  Under the Lease, Million Air is permitted to use the leased premises to operate both an LGA FBO and an HGA FBO, each of which has a distinct rent formula.

53.55.  For the LGA FBO, Million Air pays the County a percentage of gross revenue generated from its LGA services, with the percentage increasing over the term of the Lease. The current monthly rent for the LGA FBO is approximately $24,000.

54.56.  For the HGA FBO, under Section 4.2 of the Lease, the monthly rent is pegged to the acreage used by the improvements. For the first 42 months of the Lease term (i.e., through the end of 2019), during which time it was contemplated that work on the InitialProposed Improvements would proceed and be completed, rent was $261,360 annually, corresponding to $1.00 per square foot over six acres. Starting in January 2020, the annual rent for the HGA FBO increased to approximately $747,000 annually, corresponding to $1.85 per square foot over nine acres.

55.57.  Section 4.2 of the Lease also provides that if Million Air constructs improvements on the leased premises in addition to the InitialProposed Improvements, subject to the County's consent and approval in accordance with Article 6 of the Lease, Million Air must pay additional rent corresponding to the additional acreage covered by such improvements.

56.58.  Section 4.2 provides the following example of additional improvements that could be made under Article 6, thereby leading to a rent increase: "Example: Lessee **builds additional**

13

**hangars** on 3 more acres. Annual rent in connection with the Fixed Base Operation is at that time $1.95 per square foot. Annual rent in connection with the Fixed Base Operation will be calculated on 12 acres total." (Emphasis added.)

59.    Section 4.2, which references the construction of "additional hangars" pursuant to Article 6, therefore clearly reflects the parties' understanding that Million Air would be able to expand upon the ~~Initial~~Proposed Improvements by constructing the Modified Hangar (and other hangars).

60.    In addition to Section 6.2, the Lease includes a second provision allowing for improvements beyond the Proposed Improvements. That provision, Section 5.5, states in relevant part:

> **Following the completion of the Proposed Improvements**, plans and specifications for all major repairs, construction, alterations, modifications, additions or replacements (hereinafter referred to as "improvements") undertaken by the Lessee shall be submitted to and receive the written approval of the County, and no such work shall be commenced until such written approvals are obtained from the County **which approval shall not be unreasonably withheld, conditioned or delayed**. County shall advise Lessee within forty (40) days after receipt of the written request, together with copies of the plans and specifications for the proposed improvements in sufficient detail to make a proper review thereof, of its approval or disapproval of the proposed work, and in the event it disapproves, stating its reasons therefor. (Emphasis added.)

**The Success of the ~~Initial~~Proposed Improvements**

~~57.~~61.  Million Air ~~has~~ invested more than $50 million in constructing and completing the ~~Initial~~Proposed Improvements, which have been an unmitigated success for the Airport and the County.

~~58.~~62.  Indeed, at the May 2018 opening of Million Air's new 50,000 square foot hangar, Ben Boykin, the Chairman of the County BOL, lauded the ~~Initial i~~Improvements Million Air had built at the Airport, stating that "this is really an economic engine" and further extolling the

14

benefits of the increased hangar capacity in that it reduced air traffic: "Now, the jets don't have to come in, leave and go to Teterboro or Connecticut, then come back and pick up the individuals that have been dropped off . . . . That really cuts out two flights a day."[2]

59.63.  At the grand opening of Million Air's new terminal in February 2019, Boykin noted that the InitialProposed Improvements would create jobs in the community, stating: "Those who run businesses will be flying in and out of here so that they can conduct business in Westchester County."[3]

60.64.  The InitialProposed Improvements also have created jobs at the Airport. With the new FBO and hangar, Million Air employs over forty permanent employees at the Airport.

61.65.  Beginning in the summer of 2017, and in full anticipation of the County granting consent to the construction of the Modified Hangar, Million Air began negotiating leases for space in the Modified Hangar with prospective hangar tenants. Several prospective hangar tenants signed letters of intent to rent space and made deposits. The total potential rent from these tenants exceeded $7 million annually.

**Million Air Informs the County of Its Plans to Build the Modified Hangar**

62.66.  In or about September 2017, Million Air approached the County concerning its intention to move forward with the original plan for the leased premises – namely, the replacement of the Existing Hangar, as depicted in Schedule C of the Lease, with the Modified Hangar.

---

[2] *See* Matt Coyne, "Million Air cuts ribbon on new Westchester County Airport hangar," Rockland/Westchester Journal News (May 2, 2018), *available at* https://www.lohud.com/story/news/transit/2018/05/02/million-air-cuts-ribbon-new-westchester-county-airport-hangar/573273002/ (last visited June 15, 2021)

[3] *See* Peter Katz, "A party, a concert and the future of Westchester County Airport," Westchester County Business Journal (Mar. 1, 2019), *available at* https://westfaironline.com/111571/a-party-a-concert-and-the-future-of-westchester-county-airport/ (last visited June 15, 2021)

63.67.  Million Air informed the County that the Modified Hangar would be constructed with an updated and more efficient design than the Existing Hangar. Million Air also noted that the business relationships that Million Air would create and cultivate through the construction of the Modified Hangar would bring additional business, jobs, and tax revenues to the County.

64.68.  The proposed Modified Hangar would also provide additional economic benefits to the County. Under Section 4.2 of the Lease, the County would receive significant additional rental income from Million Air for the Modified Hangar. The County would further realize a substantial increase in fuel flowage fees from aircraft hangared at the Modified Hangar, as those aircraft would refuel at the Airport rather than at surrounding airports.

65.69.  Moreover, the proposal promised significant environmental benefits. In particular, the construction of the Modified Hangar would permit more arriving aircraft to be hangaered at the Airport, rather than having to fly to nearby airports to be hangaered while awaiting return flights. The Modified Hangar therefore would significantly reduce the need for such ferry flights into and out of the Airport, and would correspondingly reduce carbon emissions and noise, the latter of which the County has repeatedly stated is a paramount concern.

66.70.  The staff of the then-Westchester County Executive, Robert Astorino, told Million Air that the County supported construction of the Modified Hangar. However, because Astorino was focused on a heated re-election campaign against challenger George Latimer, Astorino's staff asked Million Air to hold off on making a formal request regarding the Modified Hangar until after the November 2017 election.

67.71.  Million Air complied with the County's request and refrained from pursuing the Modified Hangar during the final weeks of the campaign.

68.72.  In the final weeks before the November 2017 election, Latimer aligned himself with a local group called Citizens for a Responsible County Airport, which publicly opposed any development at the Airport.

69.73.  Latimer defeated Astorino in the election, with his four-year term starting on January 1, 2018. Shortly after the election, Latimer appointed the leader of that opposition group to his transition team.

### Million Air's Formal Submission of its Modified Plans and the County's Initial Denials

70.74.  By letter dated November 14, 2017, Million Air formally submitted to the County its Modified Plans for the Modified Hangar, pursuant to Section 6.2 of the Lease.

71.75.  In this submission, Million Air enumerated some of the benefits of the Modified Hangar to the County and Airport, including a reduction in landings and takeoffs due to reduced ferry flights; a corresponding reduction in noise and pollution; the benefits of a world-class FBO facility and hangar at no increased cost to the County; the addition of high-paying jobs to the community, including mechanics and pilots; and increased revenue to the County as a result of increased rent paid by Million Air.

72.76.  Despite the County having consistently expressed its support for the Modified Hangar, by letter dated December 12, 2017, the County's Commissioner of the Department of Public Works ("DPW"), Vincent Kopicki, disapproved of the Modified Plans for the Modified Hangar.

73.77.  In its December 12, 2017 letter, the County explicitly stated that it was denying approval "pursuant to Section 6.2 of the Lease." The stated bases for the County's decision were that (1) the Modified Hangar was not "required" and (2) environmental and other regulatory approvals needed to be obtained *prior* to the County's approval.

17

74.78.  Neither of those justifications was supported by the terms of the Lease.

75.79.  First, under Section 6.2 of the Lease, the County may not reject Modified Plans simply because it unilaterally and conclusorily determines they are not "required."

76.80.  Instead, under Section 6.2, the County must "specifically identify[]" a reasonable "objection" to the Modified Plans and state "the reasons therefor." This permits Million Air to exercise its right under Section 6.2 to "further amend the Modified Plans, taking into consideration the County's objection and the reasons therefor."

77.81.  Second, the County's position that Million Air had to procure all environmental and other regulatory approvals *prior* to the County's approval is contradicted by Section 6.5 of the Lease and by commonsense industry practice.

78.82.  Under Section 6.5, the County is required to "assist and cooperate with [Million Air] in good faith" in obtaining "any and all approvals" required from any governmental authorities in connection with any "Modified Plans" permitted under Section 6.2. The County therefore must approve Modified Plans *before* it assists Million Air in obtaining approvals from other government bodies for such plans.

83.    Section 6.5 of the Lease is consistent with customary practice in land use development projects, especially where a tenant is seeking to build out or develop its leased premises. Typically, a landlord approves proposed plans under a lease, and environmental conditions are attached that must be satisfied before construction can commence. Indeed, without approved plans, there cannot be any meaningful environmental review and app

79.84.  Although the County's approval of the Modified Hangar plans was unreasonably withheld, in a good-faith attempt to obtain approval, Million Air, by letter dated December 19, 2017, responded to the County by pointing out that the County was not empowered to reject

18

Modified Plans simply based on a unilateral determination that they are not "required." Million Air nevertheless set forth several additional benefits of the Modified Hangar.

80.85.  In its December 19, 2017 letter, even though not required under Section 6.2, Million Air also demonstrated that it had provided the County with all information requested in the County's December 12, 2017 letter concerning environmental and regulatory requirements.

81.86.  By letter dated January 17, 2018, the County again refused to approve the Modified Hangar plans.

82.87.  In its January 17, 2018 letter, the County changed its position. A month after initially rejecting the Modified Plans in express reliance on Section 6.2 of the Lease, the County now claimed that Section 6.2 of the Lease did not apply at all. That was because, in the County's new view, the Modified Hangar was a "new project" and not a "modification" of the Plans for the leased premises covered by Section 6.2.

83.88.  The County's contention that the Modified Hangar was a "new project" was inconsistent with both its prior reasons for disapproving the Modified Plans for the Modified Hangar and the plain terms of Section 6.2. In addition, Section 4.2 of the Lease specifically cites the construction of "additional hangars" as the type of "improvements" that are covered by Section 6.2.

84.89.  In its January 17, 2018 letter, the County also restated the unreasonable objections it had articulated in its December 12, 2017 letter, namely, that the Modified Hangar was not "required," and that Million Air had not yet obtained certain regulatory approvals.

**Despite the County's Initial Denials, the Parties Take Steps Toward Approving and Constructing the Modified Hangar, and the County Requests Approval from the FAA**

85.90.  Despite refusing to approve the Modified Hangar, in its January 17, 2018 letter, the County nevertheless provided Million Air with guidance on how it might obtain certain required regulatory approvals, "in the event that [Million Air] might later convince the County that the New Project is worth pursuing."

86.91.  Specifically, the County advised Million Air to complete and submit a Stormwater Pollution Prevention Plan (SWPPP) covering *both* the InitialProposed Improvements and the Modified Hangar.

87.92.  Similarly, the County asked Million Air to prepare an Environmental Assessment (EA) covering *both* the InitialProposed Improvements and the Modified Hangar, which the County would in turn submit to the U.S. Federal Aviation Administration (FAA) for that agency's approval under the National Environmental Policy Act (NEPA). Under applicable regulations, only the County, and not Million Air, was empowered to apply to the FAA for environmental approval.

88.93.  On January 24, 2018, representatives of Million Air and the County met regarding the Modified Hangar. Representatives of the County in attendance included, among others, Kopicki (the Commissioner of DPW); Norma Drummond, the then-Deputy Commissioner of the County's Department of Planning (who was named Commissioner of that Department in June 2018); David Kvinge, the County's Director of Environmental Planning; Joseph Nicolleti, the First Deputy Commissioner of DPW; and Anthony Ventarola and Dean Cardillo from DPW.

89.94.  At the January 24, 2018 meeting, the County stated that it wanted to proceed toward approval of the Modified Hangar, but via an amended lease, which would require BOL approval, rather than through the mechanism for modifications set forth in Section 6.2 of the Lease. The County also requested that Million Air provide a list of "Policy Justifications" for the

Modified Hangar, even though Million Air had previously provided the County with the benefits and justifications for the Modified Hangar.

90.95.  Without waiving its rights under the Lease, which covered the Modified Plans for the Modified Hangar, and in an effort to cooperate with the County despite its unreasonable and inconsistent demands, Million Air began to prepare the requested amended lease, containing the Modified Plans for the Modified Hangar.

91.96.  On January 29, 2018, representatives of the parties met concerning certain environmental and regulatory requirements for the Modified Hangar. Representatives of the County at this meeting included Kvinge, Nicolleti, Ventarola, and Jeffrey Dean of DPW.

92.97.  At the January 29, 2018 meeting, the County again instructed Million Air to submit a stormwater management plan incorporating *both* the InitialProposed Improvements and the Modified Hangar.

93.98.  In fact, at the January 29, 2018 meeting, Million Air specifically inquired as to whether the County would prefer to have Million Air construct a stormwater system only as to the InitialProposed Improvements, and then alter the system upon construction of the Modified Hangar; or, alternatively, create one stormwater plan for both the InitialProposed Improvements and the Modified Hangar. The County responded that it wanted the latter, i.e., a comprehensive stormwater system that would be put in place simultaneously with the construction of the Modified Hangar.

94.99.  Million Air complied with the County's request and in February 2018, submitted revised stormwater plans merging the InitialProposed Improvements and the Modified Hangar.

95.100.       On February 14, 2018, Million Air provided the County with a draft amended lease.

21

96.101.        On February 21, 2018, Million Air submitted the "Policy Justifications" requested by the County for the Modified Hangar – one of which was the significant reduction of ferry flights to and from the Airport.

97.102.        The parties held another meeting on April 20, 2018. At this meeting, the County was again unequivocal that it supported and endorsed the Modified Hangar and that it wished for the parties to proceed with amending the Lease to explicitly incorporate the Modified Hangar.

98.103.        The County also indicated that it needed to see additional data buttressing Million Air's contention that the Modified Hangar would result in less air traffic.

99.104.        On May 2, 2018, Million Air's CEO, Roger Woolsey, met with Hugh Greechan, the County's new Commissioner of DPW, and shared the requested flight data, which demonstrated that the Modified Hangar would reduce air traffic by more than ***1,000 flights*** to and from the Airport annually.

100.105.        On May 4, 2018, Kvinge, the County's Director of Environmental Planning, wrote to Million Air's engineer and assured him that the County would submit the stormwater plans covering both the ~~Initial~~Proposed Improvements and the Modified Hangar to the FAA for NEPA approval. On July 5, 2018, Kvinge confirmed to Million Air's engineer that those plans had indeed been submitted to the FAA.

**The County Reverses Course and Again
Unreasonably Rejects the Modified Hangar**

101.106.        By the fall of 2018, the County had still not approved the plans for the Modified Hangar, nor had it moved forward with the lease amendment it had proposed.

102.107.        By letter dated October 18, 2018, Million Air again asked for approval of the Modified Hangar. By letter dated November 9, 2018, the County again denied approval,

repeating its ~~baseless~~ argument that the Modified Hangar plans constituted a "new project," rather than a modification governed by Section 6.2 of the Lease.

~~103.~~108.        The County's November 9, 2018 letter also falsely stated that it had "previously clearly and unequivocally stated that it [would] not be approving any new construction activity on the Million Air site at this time."

~~104.~~109.        Perhaps most outrageously, the County, in its November 9, 2018 letter, faulted Million Air for doing exactly what the County demanded Million Air do regarding the stormwater mitigation plan. After having expressly directed Million Air ***not*** to submit a stormwater mitigation plan for only the ~~Initial~~Proposed Improvements and instead to submit a combined plan for the ~~Initial~~Proposed Improvements ***and*** the Modified Hangar, the County faulted Million Air for doing exactly that, and identified Million Air's purported "failure" to complete a stormwater mitigation plan for the ~~Initial~~Proposed Improvements alone as an additional reason for its denial of the Modified Hangar plans. The County thereby unreasonably set, as an additional condition for its approval of the Modified Hangar, the completion of a stormwater system for the ~~Initial~~Proposed Improvements alone.

**The County Runs Afoul of the FAA and Passes the Buck to Million Air**

~~105.~~110.        As it turned out, the County had received a November 2, 2018 letter from the FAA stating that, on October 18, 2018, the FAA had learned that the County had "allowed the construction and/or partial construction" of the ~~Initial~~Proposed Improvements "prior to completion of the on-going National Environmental Policy Act (NEPA) process."

~~106.~~111.        In this letter, the FAA warned Greechan that the County's approval of the ~~Initial~~Proposed Improvements prior to NEPA review by the FAA was a "significant concern."

107.112.       The County had apparently made a significant misstep when it instructed

Million Air to complete construction of the InitialProposed Improvements without a stormwater

system, in the absence of FAA environmental approval.

108.113.       As a result, the FAA, in its November 2018 letter, "strongly advise[d]" the

County to place any further construction at the Airport "on hold until completion of the NEPA

process."

109.114.       Upon information and belief, the County's November 9, 2018 letter

reaffirming its denial of the Modified Hangar plans was motivated by the letter from the FAA –

which had been triggered by the County's own mismanagement of the NEPA approval process.

110.115.       Upon information and belief, the FAA's letter also caused the County to

send Million Air another letter, dated November 20, 2018, in which the County disingenuously

alleged that Million Air had "failed to provide stormwater mitigation and planning as required"

in connection with the InitialProposed Improvements alone. The County demanded that Million

Air prepare a stormwater management plan for the InitialProposed Improvements "in full

compliance with County and State requirements."

111.116.       By letter dated November 26, 2018, Million Air responded to the County,

reminding the County that, "since entering into the Lease, all the work undertaken or not

undertaken by Million Air at the Premises, including with respect to stormwater mitigation and

planning, ha[d] been at the express direction of the County." Such work had also been performed

under the SEQRA approval Million Air received from the BOL in May 2016.

112.117.       By letter to Million Air dated April 11, 2019, the County doubled down on

its bad-faith position, stating that the only stormwater plan "received to date is based upon

stormwater values that assume construction of a New Project [i.e., the Modified Hangar], which has not yet been approved or authorized under Million Air's lease agreement."

113.118.    In its April 2019 letter, the County demanded that Million Air implement such a stormwater management system for the InitialProposed Improvements alone. Million Air, having no choice, agreed to do so,. The stormwater system is now complete and anticipates completing such a system by late summer 2021.

114.119.    The relevant timeline demonstrates the County's bad faith:

- January 2018: The County directs Million Air *not* to submit a stormwater management plan applicable to just the InitialProposed Improvements but instead to prepare and submit a plan addressing the InitialProposed Improvements and Modified Hangar together.

- February 2018: Million Air complies with the County's direction and submits a stormwater management plan for both the InitialProposed Improvements and Modified Hangar.

- May 2018: The County's Director of Environmental Planning writes to Million Air's engineer advising that the County would submit Million Air's submitted stormwater plans to the FAA for NEPA approval.

- July 2018: The County submits Million Air's stormwater plans to the FAA.

- November 2018: The County writes to Million Air, stating that Million Air failed to submit a stormwater management plan for only the InitialProposed Improvements and cites this as a reason for denying approval of the Modified Hangar plans.

- April 2019: The County writes to Million Air demanding that it implement a stormwater management system for the InitialProposed Improvements alone.

115.120.    The implementation of a stormwater system covering only the already constructed InitialProposed Improvements requireds tearing up completed work and will entailother significant business disruption and multimillion-dollar costs to Million Air. Million Air would not have incurred these costs had the County not instructed Million Air to complete the InitialProposed Improvements *without* such a stormwater system.

**Despite Million Air's Efforts to Move Forward**
**Cooperatively, the County Continues to Delay**

~~116.~~121.        On May 31, 2019, the parties met at the County Executive's offices. Woolsey, Million Air's CEO, attended, as did the County's Executive Director of Operations, Joan McDonald.

~~117.~~122.        Despite the roadblocks the County had continuously and unreasonably thrown up, McDonald stated that the County hoped to work cooperatively with Million Air to complete the Modified Hangar project.

~~118.~~123.        McDonald asked that Million Air provide additional data as to how the Modified Hangar would reduce air traffic and noise at the Airport. She added that, if Million Air could provide an independent study supporting its contentions, the County Executive would support amending the lease to explicitly permit construction of the Modified Hangar.

~~119.~~124.        Despite having consistently and correctly taken the position that no amended lease was necessary, Million Air undertook to cooperate with the County's latest demands.

~~120.~~125.        Accordingly, Million Air retained an independent and highly reputable aviation planning and consulting firm to study the air traffic issue. In September 2019, Million Air sent the County an independent report prepared by the consultant. This report confirmed what Million Air had already explained on multiple occasions over the last two years to the County: the Modified Hangar would greatly reduce flight congestion at the Airport because it would reduce the need for ferry flights. Specifically, the report found that the Modified Hangar would reduce *net* flights in and out of the Airport by 1,222 flights annually – with concomitant reductions in noise and carbon emissions. This represented a reduction of about 30% of all ferry flights and 3.5% of *total* Airport flights.

121.126.        The consultant's report also identified another significant environmental benefit of the Modified Hangar. When aircraft take off from the Airport in winter weather, they often require de-icing, which entails spraying the planes with a chemical called glycol, an effluent that enters the stormwater system and surrounding waterways.

122.127.        Because a heated and efficiently designed Modified Hangar would permit more planes to be stored at the Airport, it would greatly reduce the need for such de-icing, thereby reducing glycol discharge and the impact on the stormwater system.

123.128.        Despite the fact that Million Air provided the County with the requested independent data on reductions in air traffic, the County, by email dated October 25, 2019, informed Million Air that it still had not approved the plans for the Modified Hangar, that an amended lease needed to be entered into and approved by the BOL for the Modified Hangar plans to proceed, and that Million Air also had to complete a stormwater system for the InitialProposed Improvements alone.

124.129.        Over the course of 2020 and early 2021, the parties continued to negotiate terms of the amended lease, notwithstanding repeated delays and a lack of responsiveness from the County. Million Air also submitted plans to the County for a stormwater system limited to the InitialProposed Improvements.

125.130.        At times it appeared that agreement on the amended lease was near and that the BOL was set to approve it.

126.131.        However, in or about April 2021, Boykin, Chairman of the County BOL, reiterated what the County had unreasonably stated in its November 9, 2018 letter – namely, that Million Air's completion of the stormwater system for the InitialProposed Improvements was a condition for BOL approval of the amended lease.

127.132.    This~~Such a~~ condition wa~~i~~s unreasonable. The delay in implementing a stormwater system for the ~~Initial~~Proposed Improvements was caused by the County's instruction to Million Air to hold off on constructing a stormwater system until the Modified Hangar was built. Indeed, had the County ~~complied with the Lease and~~ approved the Modified Plans for the Modified Hangar when Million Air first requested such approval in late 2017, instead of unreasonably withholding approval, a stormwater system for the entire project would almost certainly have been completed by now.

128.133.    Moreover, the completion of the stormwater system for the ~~Initial~~Proposed Improvements – which Million Air has already agreed to construct – does not impact the merits of the Modified Plans for the Modified Hangar. Therefore, it is unreasonable for the County to require that the stormwater system be completed prior to approving the Modified Plans.

129.134.    In sum, since 2017, Million Air has repeatedly sought the County's approval of the Modified Plans for the Modified Hangar. But for over three years, the County has unreasonably withheld, delayed, and conditioned its approval~~, in direct violation of the Lease~~.

**The County's Disparate Treatment of Million Air**

130.135.    As the County was improperly rebuffing Million Air's attempts to proceed with the Modified Hangar, throughout 2018 and early 2019 the County countenanced and facilitated lease violations by a competitor of Million Air at the Airport, Ross Aviation.

131.136.    Specifically, Ross Aviation was accommodating large planes with a gross take-off weight of over 50,000 pounds ("Overweight Aircraft") at the Airport, which is not permitted under Ross Aviation's lease.

132.137.    Despite paying only a small fraction of the rent that Million Air pays for the privilege of accommodating Overweight Aircraft at its HGA FBO, and not investing the tens

28

of millions of dollars in revamping infrastructure necessary to ensure safe accommodation of such aircraft, Ross Aviation has been permitted since late 2016 to accommodate hundreds of Overweight Aircraft at its premises at the Airport.

133.138.        This accommodation of Ross Aviation by the County places Million Air at an unfair disadvantage, as it enables Ross Aviation to offer operators of Overweight Aircraft less expensive fuel rates.

134.139.        For months, the County ignored Million Air's complaints concerning Ross Aviation's improper use of its premises.

135.140.        In March 2018, the County finally sent Ross Aviation a Notice of Default regarding its lease. But this proved to be mere lip-service. After having failed to enforce its rights under its lease with Ross Aviation for over a year, the County, in a letter dated October 17, 2018, told Ross Aviation that it would be authorized to accommodate Overweight Aircraft for a single customer while the lease was renegotiated.

136.141.        Far from according such accommodations to Million Air, the County has instead blocked Million Air at every turn with unreasonable and contractually impermissible obstacles.

**Million Air's Lawsuit**

137.

142.    Because Million Air's years-long campaign to cooperate with the County hads failed to bear fruit, and based on the County's bad-faith conduct and Million Air's belief that the County had violated the Lease, Million Air initiated the instant action on June 16, 2021Million Air now seeks the Court's intervention to put an end to the County's unreasonable actions. Million Air alleged, *inter alia*, that the County had violated Section 6.2 of the Lease by

unreasonably refusing to approve of the Modified Hangar and also violated the implied covenant of good faith and fair dealing in the Lease.

143.    The County moved to dismiss, and on March 11, 2022, the Court issued the Order denying the County's motion in part and granting it in part.

144.    The Court upheld Million Air's claim that the County breached the implied covenant of good faith and fair dealing by initially instructing Million Air to construct the Proposed Improvements without a stormwater mitigation system, on the understanding that the stormwater system for the entire site would be built when the Modified Hangar was constructed, but subsequently (after the Proposed Improvements were complete) retracting that instruction and demanding that Million Air build a stormwater system for the Proposed Improvements alone.

145.    The Court dismissed Million Air's breach of contract claim, ruling that Section 6.2 was inapplicable to Million Air's request for the County's approval of the plans for the Modified Hangar.

**Million Air Requests Approval of the Modified Hangar Under
Section 5.5 of the Lease, and the County Unreasonably Denies Approval**

146.    On March 16, 2022, Million Air sent a letter notifying the County of its desire to build the Modified Hangar, requesting approval under Section 5.5 of the Lease and attaching plans and specifications for the Modified Hangar. This letter and its attachments are attached hereto as Exhibit B.

147.    The County responded by letter dated April 22, 2022 – one business day short of the forty-day deadline under Section 5.5. This letter is attached hereto as Exhibit C.

148.    In its April 22 letter, the County did not deny that Million Air's request for approval of the plans for the Modified Hangar was properly made under Section 5.5.

149.    The County's April 22 letter did not approve the Modified Hangar under Section 5.5. Instead, the County set forth a series of purported reasons as to why its consideration of the plans would be premature, despite the fact that Section 5.5 of the Lease required the County to either approve the plans for the Modified Hangar or provide reasonable reasons for its disapproval within forty days of Million Air's request.

150.    Million Air responded to the County by letter dated May 13, 2022. This letter is attached hereto as Exhibit D.

151.    In its letter, Million Air pointed out that the County's purported objections to considering Million Air's request at this time were all unfounded and unreasonable, and therefore in breach of Section 5.5.

152.    As to the County's first and second objections – namely, that the BOL and the County's Airport Advisory Board ("AAB") had not yet had a chance to weigh in on Million Air's request – the Lease makes clear that, whatever bodies within the County need to review Million Air's request, such review must be complete by the forty-day deadline imposed by Section 5.5. The County's failure to initiate such review within that deadline was unreasonable.

153.    Moreover, on information and belief, review of Million Air's request by the BOL and the AAB was *not* required prior to approval by the County.

154.    In its third and fourth objections, the County pointed out that approval for the Modified Hangar had not yet been obtained under NEPA or SEQRA.

155.    However, the Lease clearly contemplates that the County's approval or disapproval of Million Air's requested improvements occur *before* such governmental approvals are obtained. The County, in its April 22, 2022 letter, referred to Section 5.10 of the Lease, which requires Million Air, "in making all improvements," to procure required environmental

approvals. The County also referenced Sections 6.4 and 6.5, which state that Million Air "shall erect" improvements "subject to" Million Air obtaining environmental approvals (Section 6.4), and that the County must "assist and cooperate" with Million Air in obtaining such approvals (Section 6.5).

156.     As discussed above, the only reasonable reading of Sections 5.10, 6.4, and 6.5 of the Lease is that they require Million Air to obtain environmental approvals, and the County to assist in obtaining such approvals, *after* Million Air and the County have agreed that a project should move forward. Indeed, it would not make sense for either party to expend the effort to obtain environmental approvals prior to the County's approval of a project. Therefore, the County's third and fourth objections were unreasonable.

157.     In its fifth objection, the County claimed it was required to evaluate unspecific requests from "other tenants" along with Million Air's, to ensure non-discrimination, under applicable regulations, as between the County's lessees at the Airport.

158.     But even if such an evaluation of other tenants' purported requests were a proper pre-condition under the Lease to consider Million Air's request – a proposition that finds no support whatsoever in the Lease – the Lease clearly requires that the County perform such an evaluation before the forty-day approval deadline set forth in Section 5.5 of the Lease. It was unreasonable for the County to withhold consent to Million Air's request based on its own failure to take timely action.

159.     In its sixth objection, the County claimed it could not consider Million Air's proposal until Million Air submitted certain certifications and drawings related to the Proposed Improvements. As Million Air pointed out in its May 13, 2022 response to the County's objections, it had previously provided the requested documents and would provide any additional

documentation requested by the County.

160.    This request for documents related to the Proposed Improvements, especially when Million Air had fully complied with the County's previous similar requests, simply does not constitute a reasonable basis to refuse to act on Million Air's requested improvements under Section 5.5 of the Lease.

161.    In its seventh objection, the County cited Section 6.14 of the Lease in claiming that "T-Hangars," such as the Existing Hangar, could not be removed, unless such removal was part of the initial plans for the Proposed Improvements.

162.    But the County failed to acknowledge that Section 6.14 of the Lease actually states that T-Hangars may not be removed "without County's approval which approval shall not be unreasonably withheld, delayed or conditioned." Section 6.14 simply restates what is already stated in section 5.5: the County may not unreasonably disapprove of the requested improvements.

163.    As Million Air also explained to the County, it does not seek to completely remove the Existing Hangar pursuant to Section 6.14, but instead to modify it by increasing its size.

164.    In its eighth objection, the County pointed out that, under Section 3.1(A)(i) of the Lease, Million Air was required to "endeavor to maintain the Light General Aviation ('LGA') uses at the Premises, at their current levels," and, every five years, to "evaluate market demand for light general aviation services and agree [with the County] on adjustments as necessary." According to the County, it was "unclear" whether the Modified Hangar "would maintain those LGA capabilities and services, and/or whether it [would] be sufficient to support any changes in LGA market demand that have occurred over the past five years."

165.    In its May 13, 2022 response to the County, Million Air represented that the Modified Hangar would maintain Million Air's current LGA capabilities and services at the Airport, and that, once built, it would be sufficient to support any changes in LGA market demand that had occurred over the past five years.

166.    The County, in its ninth objection, frivolously asserted that it would be "premature" to consider Million Air's requested improvements while the instant action is pending. But the fact that this lawsuit continues is simply irrelevant to the County's obligations under Section 5.5 of the Lease to timely consider Million Air's request and either approve it or provide good-faith and rational reasons for its disapproval.

~~138.~~167.    Because the County unreasonably withheld its consent to Million Air's request that the County approve its plans to build the Modified Hangar, it violated Section 5.5 of the Lease.

**FIRST CLAIM FOR RELIEF**
**(Declaratory Judgment)**

~~139.~~168.    Million Air repeats and realleges all prior allegations as if fully set forth herein.

~~140.~~169.    An actual and justiciable controversy exists between Million Air and the County concerning Million Air's rights under the Lease to have the County approve Million Air's ~~Modified Pp~~lans to construct the Modified Hangar.

~~141.~~    It is Million Air's position that ~~the Modified Plans to construct the Modified Hangar constitute a "material change or modification" to the Plans for the Initial Improvements under Section 6.2 of the Lease, and that~~ the County has breached the Lease by unreasonably withholding, delaying, or conditioning approval of the ~~Modified Pp~~lans under Section 5.5 of the Lease ~~that section~~.

34

142.170.    It appears to be the County's current position that the Modified Plans to construct the Modified Hangar constitute a "New Project" that does not fall within the scope of Section 6.2 of the Lease or, alternatively, that if the Modified Hangar does fall thereunder, (a) it is not "required" and (b) Million Air must obtain approvals from other government bodies before the County can approve the Modified Plans.

143.    For the reasons set forth above, tThe County's objections to such approval were not reasonable.  contentions are belied by the plain and unambiguous terms of, *inter alia*, Sections 6.2 and 4.2 and Schedule C of the Lease, as well as the County's representations that it intended to work with Million Air with the goal of constructing the Modified Hangar.

144.171.    At no point has the County ever set forth a reasonable objection to the Modified Plans for the Modified Hangar, as required to deny approval under Section 6.2. Nor has the County engaged in the iterative process called for by Section 6.2 that could have allowed Million Air to address any reasonable objection(s) by the County to the Modified Plans for the Modified Hangar

145.172.    Accordingly, in accordance with Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201, Million Air seeks, on an expedited basis, a declaration that the County has breached its obligations under Section 5.56.2 of the Lease by unreasonably withholding, delaying, or conditioning consent to and approval of Million Air's Modified Plansplans to construct the Modified Hangar.

146.173.    Pursuant to 28 U.S.C. § 2202, Million Air further seeks an Order from the Court ordering the County to comply with its obligations under the Lease and approve Million Air's Modified Plans plans to construct the Modified Hangar.

**SECOND CLAIM FOR RELIEF**
**(Breach of Contract)**

147.174.        Million Air repeats and realleges all prior allegations as if fully set forth herein.

148.175.        The Lease constitutes a valid and enforceable contract.

149.176.        Million Air has performed all of its obligations to date under the Lease.

150.177.        Section 5.56.2 of the Lease prohibits the County from unreasonably withholding, delaying, or conditioning consent to and approval of Million Air's Modified Plansplans to construct the Modified Hangar.

151.        By unreasonably withholding, delaying, and conditioning its consent to and approval of Million Air's pModified Plans to construct the Modified Hangar, the County has breached its obligations under Section 5.56.2 of the Lease.

152.        Section 6.5 of the Lease requires the County to "assist and cooperate with [Million Air] in good faith" in obtaining "any and all approvals" required from any governmental authorities for the Initial Improvements and for any Modified Plans.

178.        Through its bad-faith reversal of its position with respect to the necessity for FAA approval of a stormwater system for the Initial Improvements alone, the County has breached its obligations under Section 6.5 of the Lease.

153.179.        The County's breaches of contract hasve caused Million Air to turn away or lose customers who that would have rented space in or used the Modified Hangar, thereby causing Million Air to lose at least $15 million in revenuedamages. And because of the continuing nature of the County's breaches, Million Air will continue to be denied revenue from tenants interested in renting or using space at the Modified Hangar until the Modified Hangar can be constructed and completed in accordance with the Lease.

154.180.          The County's breaches of the Lease also hasve caused Million Air to lose additional revenue it would have derived from the Modified Hangar, including lost fuel sales.

155.   The County's delay in approving the Modified Plans to construct the Modified Hangar has increased the anticipated costs of such construction by approximately $12 million.

156.181.          Accordingly, Million Air is entitled to damages to be determined at trial due to the County's breach of the Lease.

### THIRD CLAIM FOR RELIEF (in the alternative)
### (Breach of the Covenant of Good Faith and Fair Dealing)

157.182.          Million Air repeats and realleges all prior allegations as if fully set forth herein.

158.183.          The Lease contains an implied covenant of good faith and fair dealing obligating the parties to act in good faith and deal fairly with each other in the course of performing their respective obligations under the contract.

159.184.          The County has advanced multiple inconsistent and bad-faith positions with respect to its obligation not to withhold its consent to and approval of Million Air's Modified Pplans to construct the Modified Hangar.

160.185.          Among these is the County's reversal of its instructions to Million Air with respect to the implementation of a stormwater management system. In 2018, the County repeatedly instructed Million Air to complete the InitialProposed Improvements without a stormwater management system. Instead, per the County's instructions, the stormwater system would be constructed along with the Modified Hangar. Million Air obeyed the County's instructions and completed the InitialProposed Improvements without a stormwater management system.

37

161.186.        However, in late 2018, the County reversed course and demanded that Million Air build a stormwater management system for the InitialProposed Improvements alone. Million Air has agreed to do so, which will entail tearing up already completed construction and will cause significant disruption to Million Air's business.

162.187.        The County also has stated that the plans for the Modified Hangar will not be approved until Million Air completes the stormwater system for the InitialProposed Improvements alone. This unreasonable condition violates the County's obligation to fairly consider the Modified Hangar plans.

163.188.        As described more fully above, the County also has required Million Air to take multiple actions, including but not limited to preparing an amended lease, commissioning an independent report regarding the benefits of the Modified Hangar, and preparing and submitting voluminous material for environmental approvals from various government bodies, which, according to the County, would enable Million Air to obtain the County's approval of the Modified Plans to construct the Modified Hangar. Despite the fact that the Lease did not require such actions for the County's approval of the Modified Plans, Million Air performed them in a good-faith attempt to work with the County and obtain approval of the Modified Plans.

164.189.        Upon information and belief, the County, in instructing Million Air to take such actions, did not intend to approve the Modified Plans even if Million Air completed the requested actions, which it did.

165.190.        In the alternative, and to the extent all of these actions by the County do not constitute a breach of the stated terms of the Lease, tThese actions violate the implied covenant of good faith and fair dealing contained in the Lease.

166.

38

~~The covenant of good faith and fair dealing contained in the Lease also obligated the~~
~~County not to encourage or foster unfair competition against Million Air.~~
~~The County was required not to act in a manner that would have the effect of destroying~~
~~Million Air's rights to receive the fruits of the Lease, to wit, the ability to enjoy the~~
~~benefits of accommodating Overweight Aircraft at its HGA FBO without competition~~
~~from other Airport tenants who did not negotiate for, and pay the necessary consideration~~
~~for, the right to accommodate such Overweight Aircraft.~~
~~By permitting Ross Aviation to accommodate Overweight Aircraft at the Airport, the~~
~~County breached the covenant of good faith and fair dealing in the Lease.~~

~~167.~~191.      Accordingly, ~~in the alternative,~~ Million Air is entitled to damages to be

determined at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Million Air demands judgment against the County as follows:

(a)     a Declaration on an expedited basis that the County has breached its obligations

under Section 5.5~~6.2~~ of the Lease by unreasonably withholding, delaying, or

conditioning consent to and approval of Million Air's ~~Modified p~~Plans to

construct the Modified Hangar;

(b)     an Order directing the County to immediately approve Million Air's ~~Modified~~

~~p~~Plans to construct the Modified Hangar;

(c)     an Order awarding Million Air damages ~~of not less than $30 million~~, the specific

amount to be determined at trial;

(d)     an Order awarding Million Air pre-judgment and post-judgment interest;

(e)     an Order awarding Million Air attorney's fees and costs;

(f)     an Order granting such additional relief as the Court finds just and proper.

Dated: White Plains, New York
          ~~June~~ May 16, 2022~~1~~

Respectfully submitted,

Yankwitt LLP

/s/ Russell M. Yankwitt
Russell M. Yankwitt
Ross E. Morrison
Benjamin C. Fishman
140 Grand Street, Suite 705
White Plains, New York 10601
Tel.:    (914) 686-1500
Fax:     (914) 487-5000
russell@yankwitt.com
ross@yankwitt.com
bfishman@yankwitt.com


Cuddy & Feder LLP

/s/ ~~Jordan M. Brooks~~ Brendan M. Goodhouse
~~Jordan M. Brooks~~
Brendan M. Goodhouse
445 Hamilton Avenue, 14th Floor
White Plains, New York 10601
Tel.:    (914) 761-1300
Fax:     (914) 761-5372
~~jbrooks@cuddyfeder.com~~
bgoodhouse@cuddyfeder.com

*Counsel for Plaintiff*