# Exhibit E



**George Latimer**
**County Executive**

Board of Legislators

Catherine Borgia
Chair

July 19, 2022

## VIA EMAIL & REGULAR MAIL

Eon S. Nichols, Esq.
Cuddy + Feder LLP
445 Hamilton Avenue, 14th Floor
White Plains, NY 10601

White Plains Aviation Partners, LLC
Hangar "M"
Westchester County Airport
White Plains, New York 10601
Attention: General Manager

White Plains Aviation Partners LLC
7555 Ipswich Road
Houston, Texas 77061
Attention: CEO Office - Contracts Administration
    Roger Woolsey

Re:   *Request Pursuant to Section 5.5 of the June 1, 2016 Lease between the County of Westchester and White Plains Aviation Partners, LLC, d/b/a Million Air White Plains*

Dear Mr. Woolsey and Mr. Nichols:

We write to you jointly on behalf of the Westchester County Executive and the Westchester County Board of Legislators ("BOL") (together, "the County"), in further response to Mr. Nichols' letter of March 16, 2022. That letter requested approval from the County, pursuant to Section 5.5 of Million Air's June 1, 2016 lease ("the Lease"), to demolish an existing 24,000 square foot "T-hangar" on the leased premises at the Westchester County Airport ("the Airport") and replace it with a new, 80,000 square foot hangar. Westchester County Director of Operations Joan McDonald initially responded to this proposal via letter dated April 22, 2022, to which you replied on May 13, 2022.

We have now had the opportunity to review Million Air's proposal together with additional information provided by Mr. Woolsey, by Avports (the County's Airport manager), and by the County's Airport Advisory Board ("AAB"). We appreciate Million Air's participation in the BOL's June 8, 2022 "Committee of the Whole" meeting and in the AAB's subsequent meeting of that same date, and your willingness to answer questions from both BOL and AAB members.[1] However, the County has determined that it cannot approve Million Air's proposal until and unless Million Air resolves the following issues.

First, as you know, the AAB raised several concerns with Million Air's proposal at the June 8th meetings. The AAB elaborated on these concerns in a June 20, 2022 letter to the County, which is attached hereto for your reference. The AAB is broadly concerned that Million Air's proposal runs counter to the requirement—codified in Section 3.1 of the Lease—that the leased premises be used "for the operation of a Light General Aviation Facility." Section 3.1(A)(i) of the Lease requires Million Air and the County to "evaluate market demand for light general aviation services and agree on adjustments as necessary." Million Air's May 13th representation that its proposed new hangar "will be sufficient to support any changes in the LGA market demand that have occurred over the past five years" does not satisfy the Lease's requirement that this market evaluation be conducted jointly.

The Lease also specifically requires "T-hangar accommodation" on the leased premises; Million Air's representation that smaller LGA aircraft (which could otherwise be accommodated in the existing T-hangar) could fit into the new 80,000 square foot hangar underneath and/or between larger jets does not satisfy this specific requirement. Moreover, at the June 8th meetings Million Air acknowledged the existence of a "waiting list" for T-hangar accommodation on the leased premises. Avports noted the existence of a similar waiting list for T-hangar space at Ross Aviation's FBO. Given this demonstrated demand for T-hangar accommodation at the Airport, the County cannot approve the demolition of an otherwise-serviceable T-hangar absent plans for an in-kind replacement.

Million Air's representation that the 24,000 square foot T-hangar is not currently serviceable, due to some combination of age and/or maintenance, is questionable. The AAB noted, in its June 20th letter, that "there is nothing about the T-hangar's design that would prevent storing of 'modern' aircraft." Moreover, Avports concluded, following a June 24th inspection, that every bay of the T-hangar is "in good condition," and the T-hangar "appears structurally sound, no leaks and no building code issues." We note that even if the T-hangar in question does have maintenance issues, it is Million Air's responsibility, under Section 5.3 of the Lease, to fix them.

Million Air's representation that the 24,000 square foot T-hangar cannot be used for LGA activities because the grade/elevation does not match the rest of the leased premises has also been questioned by the AAB, as referenced in its June 20th letter. Attached to this letter were several photographs that appear to support the AAB's contention that there is "no severe slope or 'elevation gap' to navigate." To the extent Million Air has documentation suggesting otherwise,

---

[1] The AAB is tasked, per Section 277.231 of the Laws of Westchester County, to "[m]eet with any parties and agencies, public and private, interested in the county airport and make recommendations to the county government based on its findings."

it should provide this to Avports and the AAB as soon as possible. We again note, however, that even if there is a grade/elevation issue making the 24,000 square foot T-hangar unfit for LGA activities, it is ultimately Million Air's responsibility under the Lease to resolve it.

The demand for T-hangar accommodation has apparently been exacerbated by the fact that the 24,000 square foot T-hangar in question has not housed aircraft for some time. As noted at the June 8th meetings, and as confirmed by Avports' June 24th inspection, Million Air is currently using this T-hangar for the storage of, *e.g.*, snow removal equipment, documents, furniture, construction material, a company vehicle, and waste. These are clearly not all aeronautical purposes, as required by FAA regulation. While Million Air may have taken this T-hangar out of service in anticipation of receiving approval for its proposal, the County is not now granting such approval. The County will allow a reasonable period for Million Air to present alternate proposals, but if the foregoing LGA/T-hangar issues are not soon resolved, the County will not hesitate to enforce its rights under, *inter alia*, Sections 3.1, 5.4, 7.4, and 11.1 of the Lease.

The County's second issue with Million Air's proposal is that Million Air has not "procure[d] all required approvals and/or permits (including without limitation any environmental approvals required under the ... National Environmental Policy Act," as required by Section 5.10 of the Lease.[2] Million Air argues in its May 13th letter that it is not required to obtain environmental approvals until "*after* Million Air and the County have agreed that a project should move forward." We disagree. As the County noted in recent legal filings, construction of the proposed 80,000 square foot hangar could not commence, even with County approval, until the FAA completes its NEPA review.[3] Given the FAA's November 2, 2018 letter to the County (referenced in Million Air's own complaint), which stated that "40 C.F.R. § 1506.1(a) of the Council of Environmental Quality regulations prohibits any action on the proposed project until the ... FAA makes a decision," the County cannot grant approval while the FAA's NEPA review is still pending. The County has assisted Million Air in the preparation of the Environmental Assessment under NEPA. The Environmental Assessment has been submitted to the FAA and is awaiting FAA comment or approval.

The County's third issue is the September 2019 "Activity Assessment" drafted by Landrum & Brown, and Million Air's representation that building the new 80,000 square foot hangar would reduce the number of "ferry flights" to and from Million Air's FBO. The County

---

[2] Million Air's May 13th letter criticizes the County for also citing Sections 6.4 and 6.5 of the Lease, because "neither section applies to Million Air's Section 5.5 request." This criticism is misplaced. The NEPA Environmental Assessment currently pending approval from the FAA addresses both the original "Proposed Improvements" described in Article 6 of the Lease and the 80,000 square foot hangar proposed under Lease Section 5.5, because Million Air was seeking to build this same hangar when the NEPA Environmental Assessment was originally submitted to the FAA.

[3] *See, e.g.*, Federal Aviation Administration, "Airport Environmental Review Process," *available at*: https://www.faa.gov/airports/environmental/nepa/ (stating that the FAA's NEPA "environmental review process must be completed *before* a project commences" (emphasis added); FAA Order 1050.1F – *Environmental Impacts: Policies and Procedures*, and the *Environmental Desk Reference for Airport Actions*, § 2-1.1; FAA Order 5050.4B – *NEPA Implementing Instructions for Airport Actions*, §§ 202, 1401; *see also* 40 C.F.R. §§ 1500, *et seq.* (Council on Environmental Quality NEPA regulations).

3

Case 7:21-cv-05312-VB   Document 62-5   Filed 10/11/22   Page 5 of 16

needs additional information to determine the full scope of this potential benefit, and the length of time said benefit might endure. Specifically, Million Air should provide the County, Avports, and the AAB with a list of the prospective tenants/customers/occupants for the new 80,000 square foot hangar, including aircraft tail numbers, together with copies of any relevant agreements or letters of intent. These may be provided pursuant to a confidentiality agreement.

Please note that, as Director of Operations Joan McDonald stated in her April letter, we are obligated by our federal Grant Assurances to treat all Airport tenants equally. Accordingly, Million Air's proposal to construct a new 80,000 square foot hangar must be considered together with similar requests from other FBO tenants.

Thank you again for your March 16th proposal. While we cannot approve it at this time, the County looks forward to considering any future proposals that address and resolve the above issues.

Sincerely,

Joan McDonald
Director of Operations

Catherine Borgia
Chair, on behalf of the Board of Legislators

cc (via e-mail):
George Latimer, County Executive
Kenneth Jenkins, Deputy County Executive
John M. Nonna, County Attorney
Hugh Greechan, Commissioner, Department of Public Works & Transportation
Norma Drummond, Commissioner, Department of Planning
April Gasparri, Manager, Westchester County Airport (Avports)
Nicholas Hartman, Chair, Airport Advisory Board

4

# Westchester County Airport Advisory Board

June 20, 2022

**Via E-Mail**

Hon. George Latimer
Westchester County Executive
148 Martine Avenue
White Plains, NY 10601

Hon. Catherine Borgia
Westchester County Board of Legislators
148 Martine Avenue
White Plains, NY 10601

GLatimer@westchestergov.com
Borgia@westchesterlegislators.com

Re: Follow-Up to Million Air Testimony at the June 8, 2022 Committee of the Whole

Dear County Executive Latimer and Chairperson Borgia,

On June 8th Million Air CEO Roger Woolsey, airport manager April Gasparri, and myself testified before the Committee and answered questions regarding Million Air's proposed re-development of their leasehold at the airport. Later that evening Mr. Woolsey also provided further testimony before the Westchester County Airport (HPN) Advisory Board (AAB). This letter includes additional details, photographs, and evidence relevant to the committee's discussion—including factual evidence that raises significant concern regarding key portions of Million Air's testimony during both June 8th events.

As per my testimony on June 8th there has been much discussion recently on Million Air's wishes to further develop their leasehold on the airport, and specifically to construct a new hangar on the southwest corner of the property on a site currently occupied by light-GA[1] t-hangars. However, Million Air does not presently have any approval to proceed with their desired modifications. Million Air previously claimed that their lease provided them such development approval, but the US District Court in the Southern District of New York has dismissed that claim.[2]

In parallel to the above, Million Air has taken actions to render a perfectly serviceable set of light GA t-hangars on the site in question as inaccessible for their intended purpose of supporting light GA operations at HPN. Million Air has blocked access to these t-hangars by erecting fencing between the t-hangars and the rest of the FBO's ramp (Exhibit A). Million Air is using these currently inaccessible t-hangars, and the surrounding ramp space, for storing automobiles and non-aeronautical equipment. Those actions, and the subsequent use of this facility for storing cars and non-aeronautical equipment, could be a violation of federal law on the non-aeronautical use of airport hangars.[3]

---

[1] Light GA means aircraft with a max gross takeoff weight of less than 12,500 lbs (nearly entirely consisting of piston powered aircraft)
[2] Case 7:21-cv-05312-VB White Plains Aviation Partners, LLC v. The County of Westchester Memorandum & Opinion published on 2022-03-11
[3] 14 C.F.R. as elaborated by FAA Docket No. FAA 2014–0463, published in the Federal Register on June 15, 2016 as "Policy on the Non-Aeronautical Use of Airport Hangars"

Latimer & Borgia, Page 2

Additionally, the light GA facilities on the west side of the field were constructed in part with FAA airport infrastructure funds[4] specifically for the purpose of supporting light GA at HPN. Leaving these t-hangars inaccessible is counter to the "light GA" designation of these facilities at HPN, and the stated use of federal funds procured to assist in the construction of this facility. The County has previously taken the legal position that altering the use of such facilities at HPN away from light GA towards other uses would place the County at significant liability of regulatory action from the FAA, including potentially having to re-pay infrastructure funding used to support light GA, and open the door for additional legal action from various parties.[5] Thus rendering these t-hangars inaccessible or demolishing them and replacing them with a non-light GA focused facility is, per the County's own prior legal assessment, a serious matter requiring immediate corrective action.

Any further discussion about proposed future development is moot until questions about Million Air's operation of its current configuration are fully addressed, including restoring access to these light GA facilities that have been rendered inoperable by Million Air's actions.

During their testimony Million Air addressed concerns regarding the inaccessibility of these t-hangars via a series of statements that can only be described as materially inaccurate. Specifically:

1. **Million Air's consistent testimony that the primary thing preventing use of the t-hangars right now is a severe "grade" issue that cannot be corrected.**

Across both testimony at the Committee of the Whole and later that evening at the AAB, Mr. Woolsey made a broad series of statements that the primary constraint preventing these t-hangars from being put back into service was an incompliant "grade" and "elevation change" between the t-hangars and other existing aeronautical movement areas. While these statements ultimately should be investigated by a licensed engineer, they include obviously materially inaccurate characterizations relative to what is currently visible at this location today.

In one instance Mr. Woolsey indicated that there was a 9 ft elevation that must be navigated to access the existing t-hangars:

> "The entire building got rendered completely inoperative because of the grade. You have to maybe see it to understand, but again this was built so long ago that it's literally 9 ft off the airport table, and so now that we've corrected all that on the rest of the property its got to go up this steep 9 ft incline to get to it and that's got to be rectified. So it was always anticipated to that, but it must be done in order to be able to be used again. So it's effectively dead at the moment."[6]

When viewing the actual site this statement is materially inaccurate. Exhibits A-E attached to this letter show the present condition of the area in question. Exhibit F shows a timeseries of aerial photographs starting in 2016 (when the t-hangars where actively used by light GA) and ending in June 2019 (with the use case broadly in the state it is now as seen in Exhibits A-E). Collectively, this evidence clearly shows that:

> 1) There is no observable substantive elevation change between the existing aircraft movement areas on the ramp, and the ramp outside the inoperable t-hangars,

> 2) The ramp outside the inoperable t-hangars is the same asphalt surface as was in use when the t-hangars were operable (as evidenced by the old taxi lines still visible),

> 3) The surface immediately adjacent to the temporary fencing that blocks access to the t-hangars is presently being used by aircraft, as evidenced by multiple jets in the photos. Thus, this area directly inside the fence is clearly adequate in terms of "grade" and "elevation changes," the area surrounding the t-hangars is the original surface which was previously in use, and the small gap between the two is

---

[4] Via a Passenger Facility Surcharge approved by the FAA for use in support of light GA infrastructure at HPN
[5] January 11, 2007 letter from Westchester County to DelBello Donnellan Weingarten Tartagilia Wise & Wiederkehr, LLP in response to a request from their client (Panorama Flight Service) to shift the purpose of their facility away from light GA towards heavy GA and other activities. See Exhibit I for excerpt of that text.
[6] Westchester County BOL Committee of the Whole 2022-06-08 meeting recording at 42:56

> broadly flat. As evidenced by the photographs, there is clearly no "9 ft elevation change" that must be navigated to transit between the existing active ramp and the t-hangars.

During the AAB meeting later that evening Mr. Woolsey was shown photos of the area and challenged on his assertions about the "grade" and assertions about a "9 ft incline" as preventing use of the t-hangars. Mr. Woolsey re-iterated his assertion that the grade of the property was the sole item preventing use of the t-hangars, with statements including:

> "I'm not going before you and the public making a false statement. There is a grade issue of why that cannot be used."[7]

> "I cannot use it for small planes, I cannot use it for large planes, the land has to be re-topographed to match the airport elevation. It's an elevation issue."[8]

> And when challenged again on why the t-hangars cannot be used: "The simple answer is that the grade, the elevation, of where those t-hangars are today do not match the grade and topographical elevation of the rest of the property."[9]

Given the obvious discrepancy between Mr. Woolsey's statements and photographs of the site the AAB continued to challenge Million Air's positions on multiple occasions. In one instance, Mr. Woolsey tried to explain this "grade" issue further, stating:

> "I'm going to make up some numbers… but from the taxiway, all the way up to the runway, all the way back to those hangars let's pretend that it was a 4 degree slope all the way for that 3,000 ft. Now because of the new development it all needed to be level for FAA requirements and meeting code. Now let's say there's not a 4 degree slope all the way from that taxiway all the way back to that t-hangar, it's flat… so now I've only got about a hundred feet to get from that flat all the way back up to that elevation, so it's no longer 4 degrees it's a higher pitch. I know optically it doesn't quite look that way. When they were doing the construction I did stand next to it and it came up to my shoulders at one point and I thought I can't believe this. But that's just the way it was and I'm sorry, but that's just the facts that we're dealing with."[10]

Photographic evidence again clearly refutes this testimony as a materially inaccurate characterization of what happened during the construction cited by this statement. As exhibits A-E show, the final grade of the pavement adjacent to Hangar 1 is broadly at the same level as the pavement outside the inoperable t-hangars. There is no severe slope or "elevation gap" to navigate.

Furthermore, the airport manager testified during the committee meeting that the "grade" of the location in question appears entirely consistent with relevant regulations. The airport manager also stated that HPN includes other ramp and taxi areas that have far more severe slopes than anything observed here, with no concern from an operational or regulatory standpoint.

Even if this "grade" issue was accurate this would be a problem entirely of Million Air's own creation given that the area was previously used by light GA without issue. Thus, even in that unlikely scenario, it would be entirely reasonable for the County to simply ask Million Air to fix the claimed "grade" problem, which they would have created, and return the t-hangars to service without further delay.

**2. Million Air's testimony that the existing t-hangars are not suitable for use in their present form**

During the Committee of the Whole, Million Air's attorney Eon Nichols referred to the inoperative t-hangars as

---

[7] AAB 2022-06-08 meeting recording at 1:55:25
[8] AAB 2022-06-08 meeting recording at 1:56:35
[9] AAB 2022-06-08 meeting recording at 1:50:00
[10] AAB 2022-06-08 meeting recording at 2:18:50

Latimer & Borgia, Page 4

"dilapidated,"[11] and Mr. Woolsey separately referred to these t-hangars as "garbage"[12] and designed for "yester-year type aircraft"[13].

Mr. Nichols's use of the word "dilapidated" to describe the facility is odd given Merriam-Webster's definition of that word to mean "decayed, deteriorated, or fallen into partial ruin especially through neglect or misuse." Taken at face value, Million Air's attorney appears to be admitting that Million Air is in material breach of Article 5 of their lease pertaining to maintenance of facilities. Semantics aside, the t-hangars in question are of a modern design that is identical to the two other t-hangars currently in use on Million Air's leasehold. Despite Mr. Nichols's testimony to the contrary, there is also no evidence that they are beyond serviceable use. Given their young age by general airport facilities standards (less than a third of the age of some other active hangars on the field), any issues with their serviceability would only be the result of Million Air's failure to appropriately maintain the facility.

During the June 8th committee meeting Vice Chair Nancy Barr asked Mr. Woolsey for clarification on his use of the term "garbage" to describe the t-hangars and asked if it was "garbage" when Million Air took over management of the FBO. Mr. Woolsey responded by saying:

> "So when we first approached that hangar was in use… but it was old and it was housing the loud old aircraft that were in there and not the new generation. And in order to do phase one, it had to be rendered inoperative, uh, for the land use. So it today it is literally just a building and shell there. There's no aircraft inside of it, and it cannot house them because of this grade issue."[14]

> Mr. Woolsey went on to confirm that the hangars were currently being used for non-aeronautical use, stating that it may have some "ground equipment" and that there is "no airport activity inside of it."[15]

Beyond previously highlighted concerns regarding the "grade" comments, Mr. Woolsey statements about "the loud old aircraft" are also materially inaccurate as it pertains to these t-hangars. First, regarding light GA the general size of aircraft has broadly remained unchanged for 70+ years and thus there is nothing about the t-hangar's design that would prevent storing of "modern" aircraft. For example, Million Air hosts Performance Flight, which is a dealer for Cirrus Aircraft including the incredibly popular SR20/22 series of single engine piston aircraft—with a long waitlist of customers looking to receive new aircraft from the factory. The existing t-hangars are ideal for storing an SR20/22.

The characterization of aircraft stored in the t-hangars as "loud" is also inaccurate. Broadly speaking, light GA piston aircraft are consistently quieter than the larger jets Million Air seeks to store within their proposed hangar. Million Air clearly desires to store larger aircraft at this location, such as the 737s as depicted to the AAB during a 2021 presentation (Exhibit H), but there is no validity to Million Air's statements about the hangars being "dilapidated" or otherwise not well suited for storing light GA aircraft (old or new)—the intended use of this land at HPN.

Later that evening, Mr. Woolsey offered up an entirely different characterization of the t-hangars—shifting from calling them "garbage" to now saying his business was suffering significantly from not being able to use these for storing light GA aircraft when telling the AAB:

> "We have lost millions of dollars in revenue if we would have been able to continue to operate that as a t-hangar while we asked for this phase 2…. but we can't without tearing down the grade to match the rest of the property."[16]

Given that most recent statement, Million Air clearly would like to see these t-hangars returned to service. The airport manager confirmed that there is a waiting list of aircraft looking for t-hangar space at HPN, and the

---

[11] Westchester County BOL Committee of the Whole 2022-06-08 meeting recording at 41:55
[12] Westchester County BOL Committee of the Whole 2022-06-08 meeting recording at 44:56
[13] Westchester County BOL Committee of the Whole 2022-06-08 meeting recording at 24:55
[14] Westchester County BOL Committee of the Whole 2022-06-08 meeting recording at 44:42
[15] Westchester County BOL Committee of the Whole 2022-06-08 meeting recording at 46:23
[16] AAB 2022-06-08 meeting recording at 1:52:45

Latimer & Borgia, Page 5

"grade" argument appears unsupported by basic facts. Without any current approval to do anything else of aeronautical use with this site, access to these t-hangars should be restored without delay.

### 3. Million Air's assertions that their actions have not reduced light GA capacity at their FBO

When asked what happened to the light GA aircraft previously in the now inoperative t-hangars, Mr. Woolsey stated that "100% of the light GA that was inside there is in Hangar 1 now."[17] (Hangar 1 being the large hangar that Million Air recently added to their leasehold).

Million Air tenant J. Scott Dyer independently investigated these claims following the June 8th meetings. In a June 12, 2022 letter to the Board of Legislators, Mr. Dyer shows photographs depicting the interior of Hangar 1 as seen on June 10, 2022. There are no piston light GA aircraft observed inside the hangar. The only aircraft that classifies as a "light GA" aircraft observed in the hangar was a Cirrus Vison Jet, which was manufactured after the date that the t-hangars were rendered inoperative and thus could not have been an aircraft that was "relocated" from those hangars.

Mr. Dyer also provided photographs of Million Air's other hangar as seen on June 10th, which also failed to find any light GA piston aircraft housed there at that time. Per the airport manager, the t-hangar removed from service can store 13 light GA aircraft. Thus if Mr. Woolsey's statement was accurate about currently storing the inoperative t-hangar's light GA aircraft in these other hangars, one would expect to see something in the ballpark of 13 light GA aircraft stored within the two large hangars on Million Air's leasehold.

With zero such aircraft observed on June 10th, it is theoretically possible that the 13 theoretical light GA aircraft that would normally be stored in the now inoperable t-hangars were out flying on June 10th and thus not in either of Million Air's larger community hangars. However, the probability of this occurring is extremely small. Rather, it is far more probable that these larger hangars are not currently being used to store 13 light GA aircraft and thus the practical space available for light GA hangar storage has been reduced by Million Air's actions rendering these t-hangars inoperable.

Furthermore, Million Air presented its future hangar plans to the AAB at a March 10, 2021 meeting, including multiple mock-ups depicting various aircraft storage configurations. None of these presented configurations showed even a single light GA aircraft in storage (Appendix J). Thus while we can take Mr. Woosley's testimony at face value, the preponderance of evidence does not support the idea that previous actions, or proposed future actions, would net benefit light GA beyond simply returning the existing t-hangars into service.

All the above represents my testimony to the committee as a follow-up to June 8th. The whole AAB formally opined on the issue of these t-hangars during our May 11, 2022 meeting, during which the AAB membership passed a motion[18] to express three specific concerns regarding current activities at Million Air, including:

1) An existing and perfectly serviceable t-hangar was intentionally rendered inoperable for aeronautical use by moving the airport perimeter fence such that this hangar is now outside the Air Operations Area (AoA). This was accomplished by erecting a fence across an existing portion of the ramp, removing the ability for aircraft to enter or exit the hangar

2) Further exacerbating '1' the pavement immediately surrounding the t-hangar was converted into car parking spaces, which both represents conversion of this land into a non-aeronautical use and further blocks access for aircraft to use the t-hangars for their intended use of aircraft storage

3) Per information presented to the AAB by airport operations, these t-hangars are currently being used to store miscellaneous construction equipment and building supplies and not aircraft, which appears to be a violation of FAA regulations on the non-aeronautical use of airport hangars

---

[17] Westchester County BOL Committee of the Whole 2022-06-08 meeting recording at 46:35
[18] **Aye:** Salvatore Cresenzi, Robert Fleisher, Tracy Schultz Levy, Peter Schlactus, Nancy Barr, David Gelfarb, and Nicholas Hartman
   **Abstention:** Commissioner Hugh Greechan, Commissioner Norma Drummond
   **No:** (none)

Latimer & Borgia, Page 6

In light of that motion, subsequent testimony by Million Air on June 8th that did little to adequately address the above concerns, and the lack of any alternative development plans on using the property in question for aeronautical use, I urge the County to compel Million Air to place the inoperative t-hangars back into aeronautical service without delay.

Respectfully,

Nicholas T. Hartman
Chairman
Westchester County Airport Advisory Board

Ecl.  Supporting Exhibits A-J

Cc:  Nancy Barr, Vice Chair, Westchester County Board of Legislators
Ken Jenkins, Deputy County Executive
Joan McDonald, Director of Operations
John M. Nonna, County Attorney
David Chen, Deputy County Attorney
April Gasparri, Westchester County Airport Manager

Latimer & Borgia, Page 7

## Attached Exhibits

**Exhibit A: Conversion of Aeronautical Land into Non-Aeronautical Use and Abandonment of Existing T-Hangar**




**Prior State**
- T-Hangar with direct ramp access
- Tie-down locations around the permitter of the ramp

**Present State**
- Fencing erected to now position the t-hangar outside the ramp
- Conversion of aeronautical land (the original ramp) into car parking spaces
- Creation of a small connection between the original ramp and original parking lot
- Removal of previous tie-down locations on the perimeter of the ramp

**Exhibit B: Current Pavement Outside of Existing T-Hangar**



**Notes**
- Surface in front of the existing t-hangar is broadly flat and covered in crushed stone and partially broken asphalt



Photo taken June 12, 2022

Latimer & Borgia, Page 8

**Exhibit C: Current Pavement Outside of Existing T-Hangar**



Notes
- Connection between the area in front of the t-hangars to the pre-existing ramp asphalt is level
- Existing ramp markings are visible between the parked cars

Photo taken June 12, 2022



**Exhibit D: Current Pavement Outside of Existing T-Hangar**



Notes
- Connection between the area in front of the t-hangars and the current Million Air ramp is broadly level
- Aircraft are consistently parked on the area directly adjacent to the fence line indicating no issues with the asphalt or grade directly adjacent to the temporary fencing

Photo taken June 12, 2022



Latimer & Borgia, Page 9

**Exhibit E: Current Pavement Outside of Existing T-Hangar**



**Notes**
- Aircraft are consistently parked on the area directly adjacent to the fence line indicating no issues with the asphalt or grade directly adjacent to the temporary fencing



Photo taken June 12, 2022

**Exhibit F: Current Pavement Outside of Existing T-Hangar**



**Notes**
- Aircraft are consistently parked on the area directly adjacent to the fence line indicating no issues with the asphalt or grade directly adjacent to the temporary fencing



Photo taken June 12, 2022

**Exhibit G: Timeseries of Construction**



April 2016
Google Earth



September 2017
Google Earth



May 2018
Google Earth



June 2019
Google Earth

Latimer & Borgia, Page 10

**Exhibit H – Million Air's mock-up of a use case scenario for the proposed new hangar**



**Exhibit I – Excerpts from Westchester County's Letter Re: Conversion of Light GA Facilities at HPN**

> **Panorama Request:** Provide for the construction of additional facilities on the Lease hold. Panorama would like to build additional facilities on the leasehold, subject to location and airport, county, state, federal and environmental approvals. These additional facilities may include a service hangar and/or a canopy to cover aircraft while they are boarding and being fueled. The canopy will service as a convenience for pilots and passengers and also reduce the amount of deicing used during the winter months which of course would be an environmentally welcomed by-product. This is also an amendment that would justify additional rent. This modification would create an opportunity to generate additional revenue which in turn would justify additional rent to be paid to the County.
>
> **County Response:** We would need further information and details as to what you are requesting, and the proposed locations within the leasehold.
>
> Furthermore, while Panorama's suggested alterations to the agreement would increase the value of Panorama's leasehold and conceivably result in greater compensation paid to Panorama upon the proposed assignment, these alterations would run directly counter to the County's goal of maintaining and supporting Light General Aviation at the Westchester County Airport.
>
> Your only offer to the County in exchange for these alterations is an increased rent payment schedule. These payments are not even close to payment schedules of our three large FBO's. A change of this nature to the Agreement would only guarantee the County future litigation from our existing large FBO's, the light general aviation community, Aircraft Owner and Pilots Association, the Federal Aviation Administration, and the surrounding community. Additional income derived from the changes you request is not in the best interest of this administration.

and

> In addition, Federal funding was utilized for the design and construction of the two light general aviation FBO sites. The approvals for the federal grants were contingent on the County's use of these areas for light general aviation use. Under our federal grant assurances, changes to the use stipulation of these sites could obligate the County to reimburse the Federal Aviation Administration (FAA), for some or all of the funds used to design and construct the two sites. Total expenditure for both light general aviation FBO's was approximately $16,132,161.11, of which $13,191,385.90 was federally funded under the Passenger Facility Charges (PFC).

**Exhibit J: Million Air's Hangar Configuration Mock-ups Presented to the AAB in March 2021**

